## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

REGAL COAL, INC., and
VIRGIL D. LAROSA,

        Plaintiffs,

*vs*.                                                                                    CIVIL ACTION NO. 2:03CV90

DOMINICK LAROSA and
RESEARCH FUELS, INC.,

        Defendants,

and

COURTNEY F. FOOS COAL CO., INC.,

and

DOMINICK LAROSA, RESEARCH
FUELS, INC., ENERGY MARKETING
COMPANY, INC., and CREDIBLE, INC.,

        Third party Plaintiffs,

*vs*.

CHEROKEE PROCESSING, INC., and
COURTNEY F. FOOS COAL CO., INC.,

        Third Party Defendants.

## <u>ORDER</u>

On March 9, 2006 came Robert Greer, counsel representing Regal Coal, Inc., Virgil D. LaRosa and Cherokee Processing, Inc., Roblee Coal Co., Rob Jeran, and Johnny Bischoff ; Richard Gottlieb, Martin J. Glasser, and Gregory H. Schillace, counsel representing Dominick LaRosa, Research Fuel, Co. Inc., Energy Marketing Company, Inc., and Credible, Inc.; W. Henry Lawrence and Andrew Graham, counsel representing Courtney F. Foos Coal Co., Inc.; Michael Crim,

representing Virgil B. LaRosa; and James Riley and Stacy Southern, representing F. Joseph Staud for a telephonic hearing on cross motions to quash and to compel subpoenas duces tecum issued and served during the middle of February, 2006, returnable on the first day of binding arbitration (March 13, 2006).

## *HISTORICAL BACKGROUND*

On October 16, 2003, Plaintiffs Regal Coal, Inc., (hereinafter "Regal") and Virgil D. LaRosa (collectively hereinafter "Plaintiffs") filed a two-count complaint with this Court seeking declaratory and injunctive relief (Docket Entry No. 1). On November 17, 2003, Plaintiffs filed a Motion for Preliminary Injunction and Memorandum in Support of Motion (Docket Entry No. 3). Plaintiffs filed an Amended Complaint with the Court on November 20, 2003, seeking declaratory relief, injunctive relief, relief for breach of contract/unjust enrichment, relief for tortious interference with the right to contract, relief for intentional infliction of emotional distress, relief for fraud and relief for quantum merit. On December 5, 2003, Defendants Dominick LaRosa and Research Fuels, Inc. (hereinafter "Research") (collectively hereinafter "Defendants") filed their answer. The Court granted Courtney F. Foos Coal Co., Inc., intervenor status. After a preliminary injunction was granted, Dominick LaRosa, Research Fuels, Inc., Energy Marketing Company, Inc., and Credible, Inc. (hereinafter sometimes referred to as the "Dominick LaRosa Parties" or "Defendants" filed third party claims against Cherokee Processing, Inc. and Courtney F. Foos Coal Co., Inc. alleging tortious interference with business arrangement, civil conspiracy claims, accounting and other claims.

This case started out as a contract action brought by Virgil D. LaRosa and a company owned by him, Regal, against Dominick LaRosa and a company owned by him, Research. Plaintiffs allege that an agreement was reached with Defendants in 2001 calling for Plaintiffs to mine coal

Defendants owned or controlled in North Central West Virginia for a period of fifteen (15) to twenty (20) years, depending on how long it took to mine the estimated twenty (20) million tons of coal under permit and in reserve. Third Party Intervenor Courtney F. Foos Coal Company (hereinafter interchangeably referred to "Foos" or "Foos Coal") contends, in reliance on the agreement between Plaintiffs and Defendants and representations of Defendant Dominick LaRosa, he secured and obligated his company to long term supply agreements with several eastern utilities. Plaintiffs and Foos Coal contend Defendants breached the agreement starting in late 2002 or early 2003 and continued to breach the agreement by taking actions designed to make the coal remaining in the ground unavailable to Plaintiffs to mine and sell to the end user utility markets. In addition, Defendant Dominick LaRosa contends Plaintiffs and Foos and contract miners individually or in conspiracy failed to pay and account to Dominick LaRosa for all of his coal that was mined during the period of the mining (2000 to 2005). Defendant Dominick further denies any agreement was reached and denies that he breached any agreement.

With the foregoing general background, the undersigned Magistrate Judge conducted hearings incident to motions for preliminary injunctive relief which resulted in an Opinion/Report and Recommendation containing the following statement of facts which were the findings and basis for the recommended issuance of a preliminary injunction and which remain relevant to the pending discovery dispute:

*Parties*

Dominick LaRosa, a resident of Potomac, Maryland, owns three companies that are pertinent to the subject Motion. The first, Research, employs him to sell coal to utilities at the maximum price he can get any a certain time. The only employees of Research are Dominick LaRosa and his son,

Derek. Tr. p. 126 July 23, 2004, Hearing. The second, Energy Marketing Company, Inc. (hereinafter "Energy"), a West Virginia corporation, holds properties and develops properties. The only employee of Energy is Dominick LaRosa. Tr. p. 126 July 23, 2004, Hearing. The third, Credible, Inc. (hereinafter "Credible"), a Maryland corporation, owns minerals and mining permits. Tr. p. 89-90 July 23, 2004, Hearing. The only employees of Credible are Dominick LaRosa and his son, Derek. Tr. p. 126 July 23, 2004, Hearing. Of the three companies, only Credible owns coal or coal permits.

*Properties*

Dominick LaRosa acquired coal reserves and operations held by Rauer Coal (hereinafter "Rauer") through a bankruptcy liquidation sale in late 1995. Tr. p. 115 July 23, 2004, Hearing. The properties included: Permit UO401=Isaac's Run; U-24-84= 106-A; U-8-85=108-I, UO520=105-A; and U-74-83=105 East Portal and 102 Tipple combined.

It was during the mid 1990's that Christopher Blair Wolfe (hereinafter "Wolfe"), a mining engineer,[1] first became acquainted with and associated with Dominick LaRosa. Wolfe performed engineering work on the properties Dominick LaRosa had acquired from Rauer. The engineering services were paid for by Energy.[2]

---

[1]Christopher Blair Wolfe is a professional mining engineer licenced in West Virginia and Maryland. He has a B.S. in Engineering and an MBA. He has been in the coal business since 1976 and currently is self employed with Wolfe and Associates in Farmington, West Virginia. He has done underground mine mapping, ventilation plans and roof control plans for the operators, public service districts, owners of mineral interests and the DNR. Wolfe performed engineering services for Virgil, Cheyanne, Regal, the Rawhide Tipple for which he was paid $160,008.25. He still performs services for Virgil or his companies.

[2]Wolfe later sued Energy over a billing for services dispute. Wolfe did not join Dominick LaRosa personally. The suit was later settled.

Dominick LaRosa operated some of the mines from approximately 1995 through a contract miner, Global Mining (hereinafter "Global"). Global was operated by Dominick LaRosa's brother-in-law. Tr. p. 116 July 23, 2004, Hearing.

Between 1995 and 1998, Wolfe and Associates was given limited power of attorney by Dominick LaRosa to sign for Energy. Defendants' Exhibit 4. According to Wolfe, the address used by Energy during this period of time was "338 Washington Avenue, Clarksburg, West Virginia." This was the address for Robert Frashure (hereinafter "Frashure"), accountant for Dominick LaRosa. Wolfe also testified that after 1998 to middle 1999, even though his company no longer had limited power of attorney to sign documents for Energy, if he needed documents signed, he got Frashure to sign them for Energy. According to Wolfe, in the middle of 1999, Dominick LaRosa told him to get Butch Coffman at Global (hereinafter "Coffman") to sign documents for Energy. After Global ceased operations, Dominick LaRosa told Wolfe to contact Virgil D. LaRosa if something needed to be signed on behalf of Energy.

Of the coal reserves, four mines were located on the properties held by Credible: 108-I, Isaac's Run, 106-A and 105-A. The 108-I mine is located on property that is owned by Credible. The 105-A and 106-A mines are located on coal properties owned by Penn Virginia (hereinafter "Penn"). Tr. p. 90-92 July 23, 2004, Hearing.

*Agreement*

Virgil D. LaRosa and Dominick LaRosa met on several occasions during 2000 concerning the possibility of entering into a business relationship to mine the coal of Dominick LaRosa. They reached oral agreement in the late fall of 2000. Dominick LaRosa had an understanding in his mind of what his deal with Regal was. Tr. p. 159-160 July 23, 2004, Hearing.

The agreement, as discussed by the two men, included "all coal owned or leased by Dominick LaRosa in Harrison, Barbour and Upshur Counties, West Virginia, including permitted coal and non-permitted coal reserves."[3] At the time of the parties agreement, the mines previously operated by Global had been shut down. According to engineer Wolfe, the Isaac's Run Mine had been temporarily abandoned; the 106-A mine had not yet been started; the 108-I mine was an existing deep mine that had been temporarily abandoned; the 105-A mine had been inactive since 1984; the 102 Tipple was capable of being refurbished and placed back into service; and the 105 East mine had been completed and reclamation had been done by Energy in 2001. The condition of the coal according to Wolfe was:

1)     Isaac's Run - The Redstone seam of coal had roof control problems and needed rehabilitation.

2)     108-I - Similar condition to the Redstone seam of coal in the Isaac's Run Mine.

        Wolfe estimated the cost of rehabilitation to get to the Redstone seam of coal to be between one-hundred-fifty-thousand dollars ($150,000) and three-hundred thousand dollars ($300,000).

3)     106-A - This site was a pasture. Plans had to be made to establish a mine entrance before coal could be mined.

---

[3]In questioning by the Court at the July 2004 hearing, Dominick testified in response to a question to determine which of the coal mines controlled by Energy were on coal owned by Penn: "Isaac Run. 106-A, 105-A - - and there is another one that's called White." The Court questioned: "Well, but it's not involved in this litigation?" Dominick corrected the Court's misconception by testifying: "Well, but it's part of it Virgil is supposed to face up and - - yes and do like" The Court added: "Yeah. It's one of those many things that turned over in 2001, correct?" Dominick responded: "I believe - - I believe that they were going to do it in good faith."

4)      102 Tipple - Tracks, bin and conveyor needed rehabilitation.

5)      105-A - Required clean up of the high wall, construction of three (3) new portals and preparation of the existing portals to use as returns, installation of a new belt drive, and refurbishment of the electric substation at an estimated cost of fifty-thousand dollars ($50,000) to sixty-thousand dollars ($60,000).

Wolfe discussed the permits, conditions of the mines, coal reserves and projected costs of getting the mines in producing order with Dominick LaRosa and Virgil D. LaRosa in 2001. At the same time, Wolfe discussed the reserves of Pittsburgh coal available on non-permitted lands located at Isaac's Run, 105-A, 106-A and Century Reserve. Wolfe had mine maps showing the estimated tonnages of Redstone and Pittsburgh coal available to be mined on existing permits and permits that could be obtained in the future. Plaintiffs' Exhibit 27.[4] During these discussions, Wolfe testified Dominick LaRosa and Virgil D. LaRosa talked about the depletion of permitted and reserve coal

---

[4]Based on Plaintiffs' Exhibit 27, as of January 2001, it was Wolfe's opinion that:
1) The estimated recoverable tons of permitted coal available on properties of Energy was 2,870,248.
2) The estimated recoverable tons on not permitted coal available on properties of Energy was 11,620,835.
Wolfe broke those tonnages down by permits and mines as follows:
1) Isaac's Run:

|   |   |   |
|---|---|---|
| a. | Redstone | 405,101 tons in reserve under permit UO-401A |
| b. | Pittsburgh | 800,777 tons in reserve under permit U)-401A |

2) 108-I:

|   |   |   |
|---|---|---|
| a. | Redstone | 1,295,028 tons under permit U-8-85 |
| b. | Pittsburgh | 727,059 tons under permit U-8-85 |

3) 106-A:

|   |   |   |
|---|---|---|
| a. | Redstone | 349,520 tons under permit U-24-84 |
| b. | Pittsburgh | 1,202,717 tons under permit U-24-84 |

4) 105-A:

|   |   |   |
|---|---|---|
| a. | Redstone | 93,560 tons under permit UO-520A-A |
| b. | Pittsburgh | 102,800 tons under permit U)-520A-A |

based on estimated production rates.  Wolfe testified that it was understood Virgil D. LaRosa was going to be conducting mining operations on the permitted sites and would pay for development of the coal reserves on non-permitted properties.

During the discussions between Dominick LaRosa and Virgil D. LaRosa, based on information provided by Wolfe, an engineer who had performed mining engineering services for Penn, as well as for Dominick LaRosa and Virgil D. LaRosa, it was concluded there was enough coal in the permitted area and the reserves to last approximately twenty (20) years.  Plaintiffs' Exhibit 27.  Dominick LaRosa personally estimated his holdings to be twenty-million (20,000,000) tons.  He also represented that he personally owned the coal.

Under the parties' agreement, Virgil D. LaRosa was expected to: 1) pay the property taxes on the coal involved;  2) maintain the producing permits with the West Virginia Department of Environmental Protection (hereinafter "DEP"), including other properties and permits of Energy that did not generate any coal (Tr. p. 144-145 July 23, 2004, Hearing);  3) fill purchase orders for coal obtained by Dominick LaRosa;  4) deal with the DEP and other governmental regulatory agencies relative to the operations at the mines and the permits; and 5) make new mine sites as the need arose.

Under the same agreement, Dominick LaRosa was expected: 1) to sign the papers necessary for Virgil D. LaRosa to produce coal to fill the orders; 2) to sell some of the coal by arranging for purchase orders; and 3) through profits from the coal sales, to amortize a debt owed by Virgil's father (Virgil B. LaRosa) to Dominick LaRosa.  It is not clear whether Dominick LaRosa denies payment of the debt owed by the Virgil B. LaRosa was part of the consideration for the agreement.[5]

---

[5]When asked: "Did it have anything to do with the retiring of his father's debt to you?" Dominick replied: "The - - originally, I bought the property because again, the father called me and tell me they don't have the coal and you know you're the only one that know how to do this,

8

*Performance*

Following the meetings, Wolfe and Virgil D. LaRosa met and planned the development of the coal reserves. Virgil D. LaRosa incurred five-thousand dollars ($5,000) to six-thousand dollars ($6,000) in engineering fees with Wolfe in developing these plans.

Virgil D. LaRosa planned to perform the obligations he agreed to under the agreement with Dominick LaRosa through various corporate entities he owned or created. The companies he intended to use were: 1) Cherokee Processing, Inc. (hereinafter "Cherokee"), to operate the permits and produce coal from them by and through contract miners to which it leased the coal properties; 2) Regal to purchase the coal mined from the permits to fill the orders obtained by Dominick LaRosa; and 3) Cheyenne Coal Sales, Inc., to process and ship the coal. Dominick LaRosa testified he first became aware that Regal wasn't itself producing coal, but that some other party under Regal was in there working on the coal in 2001. Tr. p. 159 July 23, 2004, Hearing. However, Dominick LaRosa permitted these third parties to continue to mine after discovery because: 1) Virgil D. LaRosa had promised to sign the agreement prepared by the Pittsburgh, Pennsylvania, law firm of Kirkpatrick and Lockhart; 2) Dominick LaRosa and Virgil D. LaRosa had commitments with the utilities through purchase orders that had to be honored; and 3) the possibility of damages if they did not fulfill the purchase orders. Tr. p. 161-162 July 23, 2004, Hearing.

Dominick LaRosa had Kirkpatrick and Lockhart prepare written documents purporting to

_____

and we don't have any money. And then find out there was plenty money in the bank to pay and, but I did it again to assist my relatives who I believe, my father, I mean, and my uncle who is Virgil B. Father, always told me to respect your family. And he always told me to help Virgil all the time as long as he live, and there was 21 years difference between my dad and my uncle and I respect him like a grandfather. So, that's why I did what I did and I went in good faith that the son, Virgil David LaRosa, would comply to do the right things so that everybody could benefit by and here we are in the courtroom today." Tr. p. 143 July 23, 2004, Hearing.

contain the terms and conditions of the agreement he reached with Virgil D. LaRosa. Tr. p. 93 July 23, 2004, Hearing. The agreements were presented to Virgil D. LaRosa in late 2001. By the time they were presented, mining had already commenced. Virgil D. LaRosa refused to sign the agreement as presented because it contained a requirement that he pay for Dominick LaRosa's legal fees at Kirkpatrick and Lockhart; did not contain dollar figures in critical spaces dealing with the financial terms of the agreement; and gave a perpetual exclusive right to Dominick LaRosa to sell the coal. Dominick LaRosa interpreted this clause to mean that "all the coal going through Rawhide, Research Fuel was the exclusive agent to sell this coal." Tr. p. 113 July 23, 2004, Hearing. A second version of the agreement was drafted and presented to Virgil D. LaRosa about May 1, 2002. Virgil D. LaRosa refused to sign it for the same reasons he refused to sign the original draft. Plaintiffs' Exhibits 18 and 19.

Consistent with the parties' conversations and agreements, on November 13, 2000, a "Request For Advance Approval Of Operator Assignment (MR-19)" on behalf of Energy, Permittee, was signed with the name of Dominick LaRosa. The document was also signed by Virgil D. LaRosa on behalf of Cherokee on the same date. This document requested a limited sixty (60) day approval of assignment of the right of operation of the coal properties under Permit Nos.: UO-401 (Isaac's Run), U-74-83 (102 Tipple), and U-8-85 (108-I) to Cherokee. Plaintiffs' Exhibit 1. Energy's address is shown on the Request for Advance Approval of Operator Assignment as: "PO Box 1704 Clarksburg, WV 26302." The address on the Advertisement Application For Operator Assignment (MR-19) for Energy is: "338 Washington Ave. Clarksburg, WV 26302".[6] These are the same two

---

[6]Dominick testified he did not authorize anyone to prepare the Exhibit or to use the 338 Washington Avenue address for Energy. Tr. p. 171-172 July 23, 2004, Hearing

addresses shown for Energy in Section A-3 of the Ownership and Control Information portion of the Application submitted to DEP. On January 2, 2001, Dominick LaRosa wrote Brent Wiles (hereinafter "Wiles") of the Office of Mining and Reclamation in Philippi, West Virginia, and requested that, with respect to all permits, the address of Energy be changed to 13 East Lincoln Street, Buckhannon, West Virginia, 26201. Tr. p. 130 July 23, 2004, Hearing.

On November 13, 2000, an "Application for Change in Permit Responsibility"(herein previously referred to as "Application") was signed with the name of Dominick LaRosa seeking the same operator assignment to Cherokee as described in the Request for Advance Approval of Operator Assignment. Plaintiffs' Exhibit 1. Section A-12 of the Application shows that the applicant, Cherokee, does not claim to own the coal but has authority to mine all of the coal by "AGREEMENT." Plaintiffs' Exhibit 1.

Dominick LaRosa denies he signed or authorized anyone to sign his name to the MR-19 granting Cherokee permission to extract coal from 108-I, Isaac's Run, 106-A or 105-A. Tr. p. 123-125 and 128-129 July 23, 2004, Hearing. However, Wolfe testified he was at the meetings and stated that Dominick LaRosa told him (Wolfe) that Virgil had authority to sign his name and his company's name (Energy) to the MR-19. Wolfe also testified that, consistent with that authority, in 2001, Virgil D. LaRosa did sign Dominick LaRosa's name as an officer of Energy on the MR-19 authorizing Fairmont Energy, Inc. (hereinafter "Fairmont"), to mine at the 106-A mine U24-84. Wolfe did not see a written limited power of attorney signed by Dominick LaRosa authorizing Virgil D. LaRosa to sign Dominick's name or the name of Dominick LaRosa's company.

On March 8, 2001, Dominick LaRosa advised Wiles that Virgil D. LaRosa was fully authorized and personally assumed responsibility to act and direct for any and all the requirements

needed to comply with overall Energy permits. Tr. p. 131-132  July 23, 2004, Hearing and Plaintiffs' Exhibit No. 3 to that Hearing.

On March 28, 2001, DEP approved the Request for Advance Approval of Operator Assignment. Plaintiffs' Exhibit 1.

### 108-I

Consistent with the agreement reached with Dominick LaRosa, Virgil D. LaRosa activated Cherokee to obtain contract operators to mine the coal. He approached Robert R. Jeran (hereinafter "Jeran"), president of Roblee Coal Company (hereinafter "Roblee"), to mine the coal in 108-I. Jeran had approximately twenty-one (21) years experience in the deep mining business. Roblee signed a "Coal Production Contract" with Cherokee on April 30, 2001. Plaintiffs' Exhibit 13. Under the contract, Roblee was to mine and remove the Pittsburgh and Redstone seams of coal located in the 108-I mine located in Union District, Barbour County, West Virginia. The contract called for mining to commence within ninety (90) days. It also called for a minimum of ten-thousand (10,000) tons of Pittsburgh coal and a minimum of ten-thousand (10,000) tons of Redstone coal to be mined per month. Roblee was to be paid 91% FOB Pit price for the A coal with 14% or less ash and 91% FOB Pit for the B or dirty coal.

Roblee began mining the 108-I in July 2001. The mine was in "deplorable condition" according to Jeran. To begin operations, his company had to: bring equipment to the Redstone coal seam; install belt lines; bring power to the mine; establish ventilation; and generally cleanup and renovate the mine. Roblee invested several hundred thousand dollars to reopen the 108-I mine in 2001, expecting to be mining for a period of eight (8) to ten (10) years.

### Isaac's Run

Virgil D. LaRosa, through Cherokee, approached Signal Resources, LLC (hereinafter "Signal"), another contract miner, to deep mine the Dominick LaRosa's coal at Isaac's Run under permit UO-401 and NPDES Permit WV1010069. Cherokee and Signal entered into a written contract dated January 16, 2001, "to mine and remove, by the deep mining method only, the coal owned and contained in the Redstone seam of coal located in Isaac's Run mine, located in Union District, Barbour County, West Virginia, on the waters of Isaac's Creek, and to load said coal into trucks supplied by Lessor [Cherokee] for transport and delivery." Plaintiffs' Exhibit 14. Under the contract, Signal was to begin mining within thirty (30) days; "carry general comprehensive liability insurance of $250,000 to $500,000 for bodily injury and $1,000,000 for property damage and to take and carry comprehensive automobile liability including non-owned and hired cars with limits of liability no less that $500,000 for bodily injury and $500,000 for property damage"; and pay any and all governmental fines and assessments levied by any governmental entity as a result of the mining operations. Cherokee obligated itself under the contract to pay Signal fourteen dollars ($14.00) per ton for "A Coal" (less than 14% ash) and $12.50 per ton for "B Coal" (14% to 20.5% ash) for coal produced and sold between the 1st and 30th of the month, by the 30th day of the succeeding month.

*106 -A*

By agreement dated April 1, 2002, (Plaintiffs' Exhibit 16) Cherokee leased the coal and Isaac's Run Mine 106A (U-24-84 NPDES Permit WV1010361) to another contract miner, Fairmont. Fairmont sub-leased to Bishoff Brothers, Inc. (hereinafter "Bishoff"). Dominick LaRosa was aware of the sub-lease arrangement with Bischoff even though there is nothing in writing signed by Dominick LaRosa agreeing to the sublease. Tr. p. 87 July 23, 2004, Hearing.

Prior to the agreement between Dominick LaRosa and Virgil D. LaRosa, the 106-A permit

did not have a mine or portal.  It consisted of a highwall with little of the coal exposed.  Dominick LaRosa was getting coal orders and Virgil D. LaRosa needed the low sulphur coal in the 106-A permit to fill those orders.

In order to ready the site for mining, Virgil LaRosa had to:

1)	excavate for a mine opening.

2)	run almost a mile of electric service.

3)	put in an electric substation to change the AC current to DC current.

4)	build mine portals.

5)	finance the contract miners (Fairmont).

Virgil D. LaRosa requested that Dominick LaRosa assist in the costs of readying the 106-A mine for opening.  Dominick LaRosa refused to contribute any money.

Under the agreement of April 1, 2002, Fairmont obligated itself to "mine and remove, by the deep mining method only, the coal owned and contained in the Redstone Seam of coal located in Issac's Run Mine 106-A, located in Union District, Barbour County, West Virginia, and to load said coal into trucks supplied by Lessor (Cherokee) for transport and delivery."  Fairmont agreed to begin mining operations within thirty (30) days of signing the contract.  Under the addendum to the contract, Cherokee agreed to advance Fairmont $273,451.85 for general operating expenses.  Virgil D. LaRosa testified his company loaned Bishoff (Fairmont) $373,452.00 in order to get the 106-A mine operational.

This was confirmed by Johnny Bishoff's hearing testimony.  He stated two (2) canopies had to be constructed in order to commence mining operations.  One was built by Bishoff and the other was built by Cherokee – Virgil D. LaRosa's company.  He testified Virgil D. LaRosa arranged for

a loan of approximately two-hundred-seventy-one-thousand dollars ($271,000.00) for supplies and wages to get the mine started and another one-hundred-thousand dollars ($100,000.00) to install electric to the mine. According to Johnny Bishoff, work commenced in March 2001. Johnny Bishoff confirmed that he had conversations with Dominick LaRosa concerning the source of the money for the construction needed to open the mine during February and early March 2001, prior to Virgil LaRosa making the loans available.

Contractor (Fairmont) agreed to pay Cherokee on each ton of stoker coal sold to a third party: the royalty Cherokee owed Gebruder, Inc. (hereinafter "Gebruder"), fifteen cents ($0.15) per ton reclamation fee, an amount equal to the severance tax and black lung tax, two dollars ($2.00) per ton royalty for Cherokee, and reimbursement at the rate of one dollar ($1.00) per ton for as long as money remained due Cherokee for monies advanced. The contract also called for Fairmont to provide the same limits of liability insurance as contained in the earlier contract with Signal. However, in addition to Cherokee being named as a co-insured, Regal was also to be named as a co-insured because it "supplied trucks to the Contractor for the transportation of its coal production." The contract called for Fairmont to mine and deliver a minimum of ten-thousand (10,000) tons of coal per month and a maximum of fifteen-thousand (15,000) raw tons of coal per month from the Redstone seam. Cherokee agreed to pay Fairmont $17.35 per ton for "A Coal," consisting of 11% to 13% ash; $14.10 per ton for "B Coal," consisting of 14% to 20% ash, and market price to be agreed on for stoker coal, consisting of 10% or less ash. The compensation clause also called for an increase in the royalty paid ($0.10 per ton) if the royalty due Gebruder on the A or B coals fell below $2.10 per ton.

Johnny Bishoff testified that his contract was with Fairmont to operate the 106-A mine as

a contract miner. He stated during the October 2004 hearing that he expected active mining to last five (5) years. He estimated there remained approximately one-hundred-fifty thousand (150,000) tons of coal to be mined and that his company was mining it as the present time at tonnages ranging between the present four-thousand (4,000) to five thousand (5,000) tons per month to twelve thousand (12,000) to fifteen thousand (15,000) tons per month. He explained that the mining operation was at a point where additional tonnages could be mined easier than the conditions had allowed for the past eighteen (18) months.

*Operations*

The contract miners obtained by Virgil D. LaRosa began mining operations at the various mine sites. Based on the Mine Safety Health Administration records, Wolfe testified as follows with respect to each of the mines:

1)     there were more violations before 2001 than there were after 2001;

2)     tonnages per man hour were lower when Global operated the mines that they were for the contract miners under Virgil D. LaRosa after 2001; and

3)     there were less accidents under the contract miners obtained by Virgil D. LaRosa after 2001 than there were under Global prior to 2001. Plaintiffs' Exhibit 30.

*Coal Purchase Orders*

Dominick LaRosa was to secure coal purchase orders for his coal as it was being produced by Virgil D. LaRosa. In the early period following the agreement, Dominick LaRosa had the exclusive right to sell the coal. In the Fall of 2000, Joe Staud (hereinafter "Staud") told Virgil D. LaRosa of Courtney Foos, of Foos Coal, as a possible link to user markets for the coal to be produced from the Dominick LaRosa holdings. Since Dominick LaRosa had exclusivity with

respect to the coal in his reserves and permits, Virgil D. LaRosa suggested Foos deal directly with Dominick LaRosa.

Staud referred Foos to Dominick LaRosa in late 2000. Foos already was acquainted with Dominick LaRosa through his earlier marketing of Dominick LaRosa's Century 102 Mine coal. Tr. p. 50. July 23, 2004, Hearing. At the end of 2000, the coal being shipped by Dominick LaRosa to fill the orders at B.L. England Station (hereinafter "England Station") and Constellation Power Source Generation (hereinafter "Constellation") were too high in ash and the BTU's were too low. The plants were not able to burn the coal. The DEP shut down the Century 102 operations. As a result, Foos began talking to Dominick LaRosa about supplying coal to fill orders to eastern power plant users. From the outset of the relationship, Foos was told by both Virgil D. LaRosa and Dominick LaRosa to "never talk to the producer, to Regal. . . ." Foos honored that arrangement for approximately the first year and a half of the relationship. Tr. p. 49-52, 103 July 23, 2004, Hearing.

A Coal Purchase Order was entered into on April 2, 2001. Plaintiffs' Exhibit 4. The purchase order is on Energy's letterhead. The address of Energy is shown as P.O. Box 34668, Bethesda, Maryland, 20827. The order calls for "10 trains April trough December 2001; 1 train monthly, 2 trains August, 29 trains Jan. 1, 2002 through Dec. 31, 2002. 2 trains monthly, 3 trains a month for 5 months, Foos Coal and Research has the right to cover from another source any months seller cannot maintain shipment schedule." The coal was to be shipped to: Delmarva Power & Light, Indian River Power Plant, Millsbora, DE. Tr. p. 133 July 23, 2004, Hearing and Plaintiffs' Exhibit No. 4 of that Hearing.

A Coal Purchase Order was entered into on April 2, 2001. Plaintiffs' Exhibit 5. The purchase order is on Research's letterhead. The address of Research is shown as 10 Tobin Court,

Rockville, Maryland, 20854. The order calls for "10 trains April trough December 2001; 1 train monthly, 2 trains August, 29 trains Jan. 1, 2002 through Dec. 31, 2002. 2 trains monthly, 3 trains a month for 5 months, Foos Coal and Research has the right to cover from another source any months seller cannot maintain shipment schedule." The coal was to be shipped to: Delmarva Power & Light, Indian River Power Plant, Millsbora, DE. In every respect, except the names on the letterhead and the dates of signature, the coal purchase order #2001 which is Plaintiffs' Exhibit 5 is identical with the coal purchase order #2001 which is Plaintiffs' Exhibit 4. On Plaintiffs' Exhibit 4, Dominick LaRosa signed April 3, 2001, as president of Research on Energy's letterhead, and on Plaintiffs' Exhibit 5, Dominick LaRosa signed April 6, 2001, as president of Research on Research's letterhead. Dominick LaRosa explained this purchase order was signed because the purchase order on the Energy letterhead was a mistake. Tr. p. 134 July 23, 2004, Hearing.

A third version of order #2001 (Plaintiffs' Exhibit 6) dated April 2, 2001, involving the same parties, same tonnages of coal, same terms and conditions, was entered into and signed by the same people on behalf of the same corporations as Plaintiffs' Exhibits 4 and 5. The only discernable difference between Plaintiffs' Exhibit 5 and 6 is the format of the Quantity Order in Exhibit 6. The substance remains the same.

 A coal purchase order #2002, dated June 28, 2001, was entered on Research's letterhead. Plaintiffs' Exhibit 7. The address for Research is 10 Tobin Court, Rockville, Maryland. It called for two-hundred-fifty thousand (250,000) tons per year for 2002 and 2003 from Regal to be shipped to Atlantic City Electric Co. (hereinafter "Atlantic") at the England Station in Palermo, N.J. Payment for the coal was to be made to Research through its account with Foos Coal. The language of the order provides: "[t]his purchase order my be extended into 2004 and 2005 by mutual

agreement of all parties." Dominick LaRosa signed this purchase order as president of Research on July 8, 2001. Virgil D. LaRosa signed it on July 5, 2001 as president of Regal.

A coal purchase order #2003, dated July 12, 2001, on Research's letterhead was signed by Dominick LaRosa as president of Research and by Virgil D. LaRosa as president of Regal. Plaintiffs' Exhibit 8. The order called for one-hundred thousand (100,000) tons of coal per year from Regal to Constellation at the C.P. Crane Station in Chase, MD, for years 2002, 2003, and 2004. Payment was to be made to Research through the account of Foos Coal. This purchase order was signed by both Dominick LaRosa and by Virgil D. LaRosa on July 14, 2001.

A coal purchase order #2004 dated August 2, 2001, on Energy's letterhead was signed by Dominick LaRosa as president of Research on August 6, 2001, and by Virgil D. LaRosa as president of Regal on August 6, 2001. The order called for "one train monthly July, August, September; Two trains monthly October 2001 through December 31, 2002." The coal was to be shipped to First Energy Generation Corporation (hereinafter "First Energy"). Payment was to be made to Research through its account with Foos Coal. The purchase order gives Energy's address as a post office box in Bethesda, MD, but lists its telephone numbers as 301-469-8070 (Dominick LaRosa's telephone number) and 304-472-0024 (the 102 Tipple managed by Virgil). Plaintiffs' Exhibit 9. Tr. p. 156-157 July 23, 2004, Hearing.

A coal purchase order #2004, dated August 2, 2001, on Research's letterhead was signed on August 6, 2001. Plaintiffs' Exhibit 10. The terms and conditions of this purchase order are the same as the purchase order bearing the same date. Plaintiffs' Exhibit 9. The only difference between the two purchase orders is the letterheads used.

***Breach***

19

There were no significant problems in the relationship between Foos, Dominick LaRosa and Virgil D. LaRosa for the first year and a half.

Foos, a sixty-eight (68) year old self-employed bituminous coal broker of forty-three (43) years duration, testified at the October 2004 hearings as intervenor. Foos locates supplies of coal and connects those supplies with end users.

Dominick LaRosa suggested that Foos sign an exclusive sales agency agreement. Foos was agreeable and encouraged Dominick LaRosa to send a proposal. When the proposed agreement arrived, Foos refused to sign because it limited him from contracting with any operator/supplier within a two-hundred-fifty (250) mile radius for Foos lifetime. Tr. p. 70 July 23, 2004, Hearing.

On August 29, 2001, Dominick LaRosa individually signed a "Letter Agreement" with Foos, confirming Foos Coal "exclusive authority to establish an all rail freight rate from Rawhide to the Mansfield Power Plant of First Energy" and " to represent our coals loading over Rawhide to First Energy; and to negotiate a 2, 3, or 5 year contract with First Energy for the slurry and other coals mixed with it for Mansfield Power Plant." Foos' Exhibit 5. The "Letter Agreement" was also signed by Virgil D. LaRosa.

On April 11, 2003, Dominick LaRosa, as president of Research, wrote to Foos, authorizing him "to commit 200,000 tons from Rawhide or 102 to the England Station in years 2004 and 2005 at a price of $26.00, along with a 10% price reopener for the years 2006 and 2007." The last sentence of the letter states: "When you have finalized this with Conectiv, I will sign the standard purchase order reflecting the above." Foos' Exhibit 6.

By letter dated July 3, 2003, Dominick LaRosa, writing on Research's letterhead, stated: "Based on our long discussions and preparations, I was hopeful that we had a clear understanding

to work toward a long range goal for coal contracts up to fifteen or twenty years.  Nothing is easy.
But with my coal assets and expertise in the coal business coupled with yours, I thought we agreed
we could both make this happen, benefiting [sic] both of us for the long term.  I still believe it can
be done!"  Earlier in the same letter, Dominick LaRosa confirmed the authorization Research gave
Foos on April 11, 2003, relating to the four-year extension of the England Station purchase order.
Foos' Exhibit 7.

Based on the 2001 agreement between Dominick LaRosa and Virgil D. LaRosa, and the
continuing encouragement of Dominick LaRosa, Foos obtained coal purchase orders.

Dominick LaRosa insisted that Foos pay him direct on the First Energy orders, and Virgil
D. LaRosa  agreed.  As a result, Dominick LaRosa, through Research, paid Virgil D. LaRosa  for
the coal produced pursuant to the First Energy, as well as other, coal purchase orders.  Tr. p. 149
July 23, 2004, Hearing.

During the summer of 2002, Foos received complaints from First Energy concerning the
oversized  coal being shipped.  Honoring Dominick LaRosa's insistence that all communications
go through him, Foos contacted Dominick LaRosa with the complaints.  Dominick LaRosa assured
Foos he would  take care of it.  Foos continued to receive complaints from First Energy, and First
Energy finally shut down its operations for two days because it was not able to burn the oversized
coal.  Foos communicated with Dominick LaRosa and learned that nothing had been communicated
to Virgil D. LaRosa.  Foos then talked to Virgil D. LaRosa, who addressed the problem by running
future coal shipments through a crusher before forwarding to First Energy.

Foos began getting notifications from Regal (Virgil D. LaRosa's company) in March 2003
that they weren't getting paid.  Foos attempted to mediate the situation for approximately one year

before things started to come apart on November 15, 2003. Tr. p. 49 and 51 July 23, 2004, Hearing. During this same period of time, the first six (6) months of 2003, Foos testified Dominick LaRosa called him night after night about getting Virgil D. LaRosa out of the coal business. According to Foos, there was no logic to Dominick LaRosa's arguments. In August 2003, Dominick LaRosa asked Foos to stop payments to Virgil D. LaRosa for two (2) months to force Virgil D. LaRosa out of the coal business. Foos refused. During the period, Foos considered severing his relationship with Dominick LaRosa and wrote a letter doing so but never sent it.

The problems of non-payment continued. With respect to Purchase Order # 2003, Virgil D. LaRosa, of Regal, notified Foos that the Regal was not being paid for the coal mined by the contract miner and shipped to Constellation. Foos contacted Dominick LaRosa concerning the situation. Foos told Dominick LaRosa, "[t]here is one cardinal rule in the coal business, if you don't pay the mines you lose your reputation and you're not going to get the coal and for God's sake pay them." Tr. p. 41 July 23, 2004, Hearing. Dominick LaRosa then re-instituted payments.

Foos was again notified that Regal was not getting paid for the coal shipped under Purchase Order # 2003. Foos contacted Dominick LaRosa, who reassured him that Regal had been paid in full. Tr. p. 44 July 23, 2004, Hearing.

It was at this time that Foos became aware there was no written agreement between Virgil D. LaRosa and Dominick LaRosa. Tr. p. 71 July 23, 2004, Hearing.

Believing there was a crisis and that Regal would cut off shipments to Constellation resulting in a breach and financial disaster to Foos and Dominick LaRosa, Foos unilaterally cancelled the order with Dominick LaRosa's company, Research, executed a new purchase order directly with Regal and started paying the amounts due Dominick LaRosa and Regal for the coals shipped

directly to each in accord with what he understood to be their interests. Tr. p. 42 July 23, 2004, Hearing.

In February 2003, Foos entered into a coal order directly with Regal to supply coal to First Energy. Sometime after July 2003, Foos entered into a coal order with Regal to supply coal to Mirant. Tr. p. 58 July 23, 2004, Hearing.

With Foos' termination of purchase order #2003 with Research, no written purchase orders or agreements remained between Foos and Research or any other company owned by Dominick LaRosa as of the July 23, 2004, hearing on Defendants' Motion For Injunctive Relief. Tr. p. 45, 85 July 23, 2004, Hearing.

Foos obtained a bid from Conectiv. After repeated attempts to get Dominick LaRosa to sign, and Dominick LaRosa repeatedly refusing on the grounds that he had been advised not to accept the liquidated damages clause, Foos offered the order to Regal on July 8, 2004. Tr. p. 48 July 23, 2004, Hearing. The agreement or order was for a primary term of two (2) years, with a 10% reopener. Tr. p. 61-62 July 23, 2004, Hearing. Foos delayed renewing orders with Constellation, First Energy and Mirant so he would not be liable to supply coal to those entities after December 31, 2004. Tr. p. 61 July 23, 2004, Hearing.

Foos paid Research what Foos understood was due Research for the coal being shipped under the purchase orders. Between November 1, 2003, and October 15, 2004, Foos paid Research $229,071.60. Foos' Exhibit 8.

Dominick LaRosa complained Energy received Notices of Violation from the DEP (Defendants' Exhibit Nos. 4 and 5 of the July 23, 2004, Hearing) and Notice of Default of the lease from Penn subjecting himself, personally, and his company to liability. Tr. p. 100-102 July 23,

2004, Hearing.

Penn served Energy with the Notice of Default on May 26, 2004. Penn determined Energy: 1) assigned the leases to Credible without Penn's consent; 2) allowed the Isaac's Run mine to remain inactive for an extended period of time; 3) allowed required liability insurance to lapse. Tr. p. 188- July 23, 2004, Hearing. As of the July 23, 2004, hearing, it was the opinion of Gary Steven Begley (hereinafter "Begley"), a mining engineer with Penn, that Energy would have to do the following things in order to continue operating the Isaac's Run and the 105-A Mines:1) cure all Notices of Violation issued by the DEP, which included allowing the operation to remain inactive for excess of thirty (30) days without obtaining inactive status because of a failure to maintain insurance; and 2) sign a MR-19 Operator Reassignment to whatever operating entity would go in to operate the mine. Tr. p.190-191 July 23, 2004, Hearing. With respect to the 106-A mine, it was Begley's opinion that Dominick LaRosa's refusal to execute "some minor Article 3 on the MPDS permits that required EMC authorization" would result in the potential for Penn to lose a significant amount of coal. The modifications would permit the operator to penetrate into an existing abandoned coal mine to establish a header to get to additional coal. Tr. p. 194 July 23, 2004, Hearing. Dominick LaRosa, on behalf of Energy, responded to the Notice of Default, indicating Virgil D. LaRosa was responsible for all the problems. Tr. p. 195 July 23, 2004, Hearing and Plaintiffs' Exhibit No. 12 to that Hearing.

In response to questioning as to why Energy did not obtain general liability insurance to satisfy the violation, Dominick LaRosa testified: "Energy Market wanted the properties vacant they won't have insurance." Tr. p. 110, 163 July 23, 2004, Hearing. Dominick LaRosa admits that Cherokee obtained insurance for two years: 2001 and 2002. The DEP violation notice also asserts

reclamation of a refuse pond which contains fine coal has not been done. Dominick LaRosa testified he was working with the DEP to permit him to remove and sell the fine coal and, thereafter, reclaim the pond. Tr. p. 164 July 23, 2004, Hearing.

Begley further testified that a default by Energy would not affect Roblee in the mine it was operating because Penn had a direct relationship (lease) with Roblee. Tr. p. 208 July 23, 2004, Hearing.

Defendants' Exhibit 4 is a Notice by DEP, asserting that, in addition to a failure to submit proof of insurance on an annual basis, another serious violation was that roads were not properly maintained . Tr. p.164 July 23, 2004, Hearing.

Wolfe testified that, with respect to Isaac's Run, absent Dominick's signature in behalf of Energy on the NPDES Permit, the mine permit would be revoked by the DEP and reclamation would be ordered. According to Wolfe, this would result in the remaining coal covered by the Isaac's Run Permit not being mined unless a new permit would be obtained. Wolfe estimated that approximately one-hundred-ninety-three thousand (193,000) tons of Redstone coal could be lost if the rehabilitation required is not done before the next change in weather cycle (winter). In addition, Wolfe testified that the Pittsburgh coal could be adversely affected if the Redstone seam of coal is not rehabilitated and mined. Plaintiffs' Exhibit 28. [7]

---

[7]As Wolfe explained in his testimony, the area enclosed by the orange line represents the coal operations at Isaac's Run by Rauer to 1996. That area has been open for ten (10) years and, due to mine weathering, is in need of rehabilitation. The area enclosed by the red line on Exhibit 28 represents the area of the Isaac's Run mine operation by Global under Dominick to 2001. According to Wolfe, it, too, needs to be rehabilitated prior to another weather cycle (winter) to facilitate future mining. The area enclosed by the green line on Exhibit 28 represents the area mined by Signal between January 2001 and September 2003. It is the blocked areas outside and outlined in light gray that constitutes the remaining estimated 193,000 tons of recoverable coal at the Isaac's Run site.

With respect to the Pittsburgh coal in the 105-A area, Wolfe testified that it was not permitted, and he had not prepared a permit application for Virgil D. LaRosa to mine that coal. He stated he had begun the process of revising or amending the existing permit to "slope down" from the existing Redstone coal workings into the Pittsburgh seam of coal. This would allow the mining operation to use the Redstone portal. It is much less expensive, does not disturb the surface as construction of a new portal would, and would be easier to get approved by the DEP.

Wolfe testified the 106-A mine permit as last operated by Bishoff was in good standing.

Wolfe testified the 108-I permit needed haul road maintenance and repair, including installation of a culvert pipe. Referring to Plaintiffs' Exhibit 31, Wolfe testified: 1) the area enclosed by an orange line on Exhibit 31 represented mining by Rauer from 1993 to 1995; 2) the area enclosed by a red line on Exhibit 31 represented mining by Global between 1995 and 2001; and 3) the area enclosed by a green line on Exhibit 31 represented mining by Roblee from May 2001 to October 18, 2004. Wolfe testified there were approximately three-hundred-five-thousand (305,000) to four-hundred-ten-thousand (410,000) tons of recoverable Redstone coal left, which, at a rate of extraction of fifteen thousand (15,000) tons per month, would permit mining operations in the Redstone seam to continue for approximately nine (9) to ten (10) months. Wolfe also testified that the Pittsburgh seam of coal in the 108-I permit lay thirty-five (35) to forty-two (42) feet below the Redstone seam of coal and was available to mine. He estimated 271,778 tons of recoverable Pittsburgh coal under the permit and an additional 340,826 tons of recoverable Pittsburgh coal to the south of the permit where a new portal is under construction. Plaintiffs' Exhibit 32. Wolfe further testified that the Pittsburgh coal in the 108-I permit was part of the reserve coal discussed in his presence by Dominick LaRosa and Virgil D. LaRosa in 2001.

Wolfe also testified the Century Reserve of nine and one-half (9.5) million tons of coal was discussed with Dominick LaRosa and Virgil D. LaRosa as coal to be developed under their agreement. This discussion initially took place in the presence of Wolfe in 2001 and again in January 2003. Coffman was present during the January 2003 discussions. At that time, the discussion centered around development of a portal into the Century Reserve. According to Wolfe, a site for that portal was actually selected.

According to the testimony of Wolfe, at no time, up to the present litigation, and certainly when the parties were discussing a portal opening in the Century Reserve, was Wolfe aware that Energy had conveyed away its interest in the Century Reserve coal, as well as all of its interest in the Pittsburgh coal under 105-A, 106-A and Isaac's Run to Gebruder by agreement dated July 1, 2001. Wolfe testified that these reserves were the same reserves discussed and subjected to the 2001 agreement between Dominick LaRosa and Virgil D. LaRosa. Plaintiffs' Exhibit 33. The July 1, 2001, agreement contains the following provision:

> 12. Neither party hereto shall record this Agreement without the prior written consent of the other party hereto. Either party shall, upon the request of the other party, execute and acknowledge a "short form" memorandum of this Agreement for recording purposes in accordance with West Virginia law. Such memorandum shall contain no more than necessary in order to give constructive notice to third parties of any additional leasehold estates granted to EMC hereunder, and shall, in no case, contain any of the economic terms and provisions hereof.

The agreement also contained an Exhibit B, which provided for a right of first refusal to Energy to purchase coal offered for sale by Marion Docks, Inc., an entity designated by Gebruder as the future lessee of the coal. Plaintiffs' Exhibit 33. Dominick LaRosa confirmed to Foos, by faxed memorandum, dated October 30, 2002, that Kevin Bealko "gave Research the first refusal and the exclusive authority to offer the sale of coal." The last sentence of the memo states: "In any event,

I do have the rights of 50% of all the coal produced on the properties." Foos' Exhibit 10.

Jeran of Roblee testified that Dominick LaRosa talked to him several times about eliminating Virgil D. LaRosa and Cherokee from the picture and instead dealing directly. Jeran testified that he tried to convince Dominick LaRosa that the coal from the 108-I mine needed to be cleaned before being shipped to the power plant consumers and that Virgil D. LaRosa had a coal washing plant set up that was doing that.

Johnny Bishoff, of Bishoff, testified Dominick LaRosa stopped at the 106-A mine from time to time to ask how things were going. Approximately six (6) or seven (7) months prior to the October 2004 hearing, Dominick LaRosa asked Johnny Bishoff if he "would stay if something would happen." Johnny Bishoff testified that he ask Dominick LaRosa what was going to happen, but that Dominick LaRosa did not tell him what was going to happen or what he meant by the statement.

*Harm*

Foos testified that if Dominick LaRosa was permitted to force Virgil D. LaRosa and his contract miners off the coal properties that are the subject of the within litigation and thereby cut off the coal shipments to Conectiv (Atlantic) - England Station, Constellation (Baltimore Gas & Electric) - C.P. Crane Station, First Energy - East Lake and Mirant (Potomac Electric) - Chalk Point/Morgantown as shown by Foos' Exhibit 4, his company would be forced into bankruptcy because of the liquidated damages claims it would suffer by its failure to honor purchase orders it obtained in reliance on the representations of Dominick LaRosa and that there is a strong likelihood of rolling blackouts on portions of the East Coast of the United States served by electric utilities dependent on the coal, particularly if the coming winter is cold.

In support of this conclusion, Foos testified that the electric utility coal supply market is very tight. There is little coal to meet demand. He testified that eastern utility companies have, on average, a supply of thirty (30) days. Atlantic is down to a seven (7) day supply and is calling him daily asking for coal. In further support of his testimony and his conclusions, he offered Plaintiffs' Exhibit 25, an email he received October 15, 2004, from DiGregorio of Conectiv.com, which stated:

> "Please be advised that the current coal inventory at B. L. England is down to approximately 15,000 tons which equates to 7 days burn availability. It is imperative that Rawhide continues to ship their contracted tonnage to this plant on a timely basis as any interruption of coal shipments could prove disastrous given the extremely low inventory on the pile. The present coal inventory is at it's lowest level in the history of B.L England at this time of year when we should be building the pile for winter. As you know this is a regulated plant in New Jersey and I am extremely concerned of the runout threat which would incur the wrath of the New Jersey regulatory commission in addition to PJM and FERC investigations/lawsuits etc..."

Foos also testified to shortages at other end run electric utility users of coal. He related that Constellation ran out of coal and covered it up by paying over one-hundred dollars ($100.00) per ton for coal from New Orleans when that coal should have cost thirty dollars ($30.00) per ton. Foos stated his company provided one-third (1/3) of the coal used by Constellation but has had to cut that back by 50% or to approximately one-sixth (1/6) of the coal needed.

With respect to Foos' Merrit customer, Foos testified he had turned down a direct request to advance the shipment of coal from the end of the month to the beginning of the month in return for a cash payment of ten-thousand dollars ($10,000.00) over the cost of the coal.

Foos testified that, in his experience, an inventory of twenty (20) days was a crisis.

Based on information contained in an industry publication, Foos' Exhibit 1, Foos concluded that the current crisis is the result of three factors:

1) Rail transportation problems – delay in getting available coal from the suppliers to the users.

2)     A projected 1% increase and a protected 2.5% increase in the demand for power generation

       coal in 2004 and 2005 respectively.

3)     Coal supplies are tight and there is no surplus.

Jeran of Roblee testified that, as of the November 2004 hearing, there remained approximately four-hundred-thousand (400,000) tons of Redstone coal that could be mined and was being mined by his company at the rate of forty-thousand (40,000) raw tons per month and that the Pittsburgh seam of coal was being faced up in order to commence mining operations.  He indicated that Dominick LaRosa has approached him to continue the mining operations for Dominick LaRosa. However, Jeran testified he preferred to work for Virgil D. LaRosa.   In the event the mine was forced to cease operations, Jeran testified:  his company would be forced into bankruptcy because of the investment it has made in the mine exceeds what it has made to date in return; the forty (40) miners his company employs at the 108-I mine would be laid off; and the remaining coal in the mine may not be recovered.

Johnny Bishoff testified that if Dominick LaRosa were permitted to continue to refuse to execute the required MR-19: 1) he and his brother would probably lose everything for which they had worked because they had tied eighty-thousand dollars ($80,000.00) of their own money up in the mine and were still obligated to Cherokee and Virgil D. LaRosa for part of the start-up money that had been borrowed[8]; 2) their fourteen (14) employees would be laid off; and 3) the ability to reach approximately three-hundred-thousand (300,000) tons of additional coal using exiting mine working may be lost.  Johnny Bishoff testified that the above losses are real and possible because,

---

[8]Johnny Bishoff testified he paid $0.75 on every ton of coal shipped toward the $271,000.00 loan and that he estimated he still owed $140,000.00 on that loan plus something on the $115,000.00 loan.

on October 14, 2004, the Department of Natural Resources issued a letter which threatens closure of the mine.

Based upon the foregoing facts, on November 16, 2004 the undersigned Magistrate Judge recommended the issuance of a preliminary injunction (Docket Entry 78). Before and after the preliminary injunction proceeding (4 days), the parties were engaged in discovery pursuant to the Court's scheduling Orders. The Amended Scheduling Order of December 14, 2004 set trial of the case for March 1, 2005 (Docket Entry 94). The November 16, 2004 recommendation was accepted by the District Judge who granted the preliminary injunction by Order dated January 12, 2005 (Docket Entry 103).

### ADDITIONAL FACTS RELEVANT TO PENDING MOTIONS TO QUASH AND COMPEL

Throughout January, 2005, the parties filed dispositive motions and final exhibit and witness lists, voir dire, and proposed jury instructions in anticipation of the March 1, 2005, trial. By Order dated January 31, 2005, the Court delayed the start of the trial to March 29, 2005 (Docket Entry 120). By Order dated February 15, 2005, a little more than one month prior to the case going to trial, it was transferred to District Judge Joseph R. Goodwin for trial (Docket Entry 128). Additional claims and parties were added to the litigation before and after the injunction hearing. On March 25, 2005, three (3) days prior to the final pretrial conference scheduled before the District Judge and four (4) days prior to the start of trial, the parties reached a settlement memorialized by a "Term Sheet" (Exhibit B Motion To Quash and Motion For Protective Order By Courtney F. Foos Coal Co., Inc., Docket Entry 156).

Paragraph 1 of the "Term Sheet" provides in pertinent part: "Arbitrate all issues in pleadings, except those resolved herein between Virgil David LaRosa and his entities, Dominick LaRosa and

his entities, and Foos Coal.  **Expedited Arbitration without discovery except for a single four-hour deposition of Courtney Foos and Rule 26(a)(1) disclosures by Foos Coal.**  The parties agree that Foos Coal's contracts with utilities are subject to confidentiality agreements.  The parties further agree there will be no discovery or admissibility of Foos Coal's contracts with its utility customers, including but not limited to the price terms.  **Follow AAA Commercial Arbitration Rules, except as modified herein**" (emphasis added by the Court).

Disputes arose between the parties relative to implementation of the settlement including preparation of the settlement documents contemplated by the "Terms Sheet."  The disputes reached the point that, after multiple cross motions to show cause were filed, on September 20, 2005, the District Judge Ordered the parties to appear before a special master. (Docket Entry 145).

On the 22nd day of September, 2005, Regal Coal, Inc., Virgil David LaRosa, Dominick LaRosa, Research Fuels, Inc., Courtney F. Foos Coal Co., Inc., Energy Marketing Company, Inc., Credible, Inc., Cherokee Processing, Inc., Roblee Coal Company, Bishoff Brothers, Inc., and Courtney F. Foos, Jr., entered into a "Stipulation Of The Parties Regarding Binding Arbitration." (Exhibit to Defendant's Memorandum Of Law In Response To Courtney F. Foos Coal Co., Inc.'s Motion To Quash and Motion For Protective Order - Docket Entry 191).  In pertinent part the language of the Stipulation provides:

1.     The parties agree that this binding arbitration will be conducted under the American Arbitration Association's Commercial Arbitration Rules currently in effect, a copy of the current rules (the "Rules") is attached hereto and made a part of this stipulation as "Exhibit A."  This matter will proceed under the Commercial Arbitration Rules (R-1 through R-54), except as modified herein.

8.     The parties agree to expedited arbitration without discovery except for a single four hour deposition of Courtney Foos.  Foos Coal agrees to provide a Rule 26(a)(1) disclosure at least 3 days prior to the deposition of Courtney

Foos. The Parties agree that Foos Coal's contracts with utilities are subject to confidentiality agreements. The Parties further agree there will be no discovery or admissibility of Foos Coal's contracts with its utility customers, including but not limited to the price terms. Said prohibition regarding discovery shall not preclude a party from utilizing subpoenas duces tecum in advance of any hearing to obtain documents returnable at the hearing; however, such subpoenas duces tecum shall not seek discovery or disclosure of Foos Coal's contracts with its utility customers, including but not limited to price terms."

On the 23rd day of September, 2005, Regal Coal, Inc., Virgil David LaRosa, Dominick LaRosa, Research Fuels, Inc., Courtney F. Foos Coal Co., Inc., Energy Marketing Company, Inc., Credible, Inc., Cherokee Processing, Inc., Roblee Coal Company, Bishoff Brothers, Inc., and Courtney F. Foos, Jr., entered into a settlement agreement ("Settlement") relative to the matters at issue in the within civil action filed on October 15, 2003. Paragraph 1 of the Settlement states: "The parties agree to arbitrate all of the issues in the List of Issues for Arbitration, a fully executed copy of which is attached hereto as "Exhibit B."

The Stipulation (September 22, 2005) and the Settlement (September 23, 2005) were prepared by Martin Glasser. Drafts leading to the originals were unavailable to be given to the Court for consideration. Arguments occurred with respect to the language in the Stipulation granting a party the right to utilize "subpoena duces tecum in advance of any hearing to obtain documents returnable at the hearing," but the arguments were limited to the language being not provided for in the "Terms Sheet" document. The Dominick LaRosa parties' counsel did not verbally present that they wanted to use the subpoena duces tecum power for discovery of party and non-party witness documentation.

The Dominick LaRosa parties' counsel now argue that 5.4 of the Arbitration Protocol supports their present position. The Arbitration Protocol was prepared and signed by counsel for

33

the principal parties between January 10 and January 19, 2006, and provides in pertinent part:

> The parties will cooperate in drafting an order for entry by the United States District Court for the Northern District of West Virginia for the limited purpose of making federal subpoena power available to all parties or as otherwise may be necessary to facilitate the presentation of documents and witnesses at the hearing in this arbitration proceeding.

> The parties agree to provide draft subpoenas to the other parties' counsel by February 14, 2006. The Arbitration Panel will conduct a telephonic conference on Thursday, February 16, 2006, at 10:00 a.m., at which time the parties agree to consider with the Arbitration Panel whether they will agree to modify the parties' earlier agreement for return of the subpoena duces tecum on the first day of the hearing (March 13, 2006) or on March 10, 2006, as Defendants now request. The parties agree to issue subpoenas on or before February 17, 2006, and to provide copies to the other parties' counsel. Nothing herein shall limit any party's ability to serve additional subpoenas after commencement of the hearing.

On September 23, 2005, as part of the settlement agreement, the parties to the agreement submitted a List Of Issues For Arbitration which was supplemented on October 6, 2005.

A "preliminary/scheduling conference call" was conducted on December 6, 2005. The letter memorializing that conference call establishes the parties agreed to the start of arbitration on March 13, 2006; "agreed to exchange witness lists on February 24, 2006"; and "also agreed that the subpoenas allowed pursuant to the Stipulation Of The Parties Regarding Binding Arbitration dated September 22, 2005, shall be issued on or before February 17, 2006."

On or immediately before February 16, 2006, a dispute arose over The Dominick LaRosa parties counsel planned use of the subpoena duces tecum authority. That dispute was voiced to the arbitrators and in turn was referred to the undersigned by District Judge Joseph R. Goodwin by Order dated February 17, 2006.

It is apparent the Dominick LaRosa parties' counsel mailed a proposed order to District Judge Goodwin's office on February 17, 2006. The District Judge did not sign the Order when it

arrived in his office because the discovery dispute over the subpoenas had already been referred to the undersigned. The Order was not presented to the undersigned any time before the hearing of March 9, 2006. As of the March 9, 2006, hearing, no Order had been entered "making federal subpoena power available to all parties or as otherwise may be necessary to facilitate the presentation of documents and witnesses at the hearing in this arbitration proceeding" as provided for in 5.4 of the parties Arbitration Protocol. The Dominick LaRosa parties' counsel did not check the docket or with the District Judge's office at any time after February 17, 2006, or at any time before attempting to effect service of the subpoenas duces tecum that are now at issue to determine if the proposed Order had been entered making federal subpoena power available.

On or after February 17, 2006, the now disputed subpoenas duces tecum were served by the Dominick LaRosa parties on Movants. Thereafter, the following motions were filed: Motion to Quash and Motion for Protective Order by Courtney F. Foos Coal Co., Inc. [Docket Entry 156]; Motion to Quash and Motion for Protective Order by Regal Coal Company, Inc., Cherokee Processing, Inc., and Virgil D. LaRosa [Docket Entry 158]; Plaintiffs' and Intervenor's Joint Motion to Quash Supboenas *Duces Tecum* to Non-Parties (John Bischoff, Joe Coffman, Cheyenne Sales Co., Inc., Robert R. Fraser, Steven M. Hite, William Konya, M&M Coal Company, Inc., Deborah Reif, Roblee Coal Company, Frank Joseph Staud and Virgil B. LaRosa) or, in the Alternative, Motion for Protective Order [Docket Entry 159]; Motion to Quash or Modify the Subpoena Served upon F. Joseph Staud [Docket Entry 188]; Motion to Quash Subpoena Served upon Virgil B. LaRosa [Docket Entry 190]. Thereafter, the Dominick LaRosa parties filed their motions, to wit: Defendants' Motion to Compel the Production of Documents Under Subpoena *Duces Tecum* Issued to Roblee Coal Co., Rob Jeran and Johnny Bischoff [Docket Entry 192] and

Defendants' Motion to Compel the Production of Documents Under Subpoena *Duces Tecum* Issued to Cheyenne Coal Sales, Inc.[Docket Entry 194].

After the hearing of March 9, 2006, the parties and the arbitrators conferred and as a result, the Arbitration scheduled to start March 13, 2006 was continued by agreement to April 3, 2006.

Thereafter, the Dominick LaRosa parties filed two additional motions to compel, to wit: Motion To Compel The Production Of Documents Under Subpoena Duces Tecum To Deborah Reif (Docket Entry 206) (filed March 15, 2006) and Motion To Compel The Production Of Documents Under Subpoena Duces Tecum To Robert R. Fraser (Docket Entry 207) (filed March 15, 2006).

## *ISSUE*

Does the issuance and attempted service of the subpoenas at issue constitute a violation of the terms of the Stipulation, Settlement and Arbitration Protocol, hereinafter referred to as the "Parties' Agreement?"

If not, do the subpoenas at issue seek production of documents from parties and non-party witnesses for discovery purposes?

## *CONTENTIONS OF THE PARTIES*

### *Challengers To The Issued Subpoenas*

Generally the challengers to the issued subpoenas contend:

1)      Violation of the Parties Settlement Agreement providing for no discovery except for the one four (4) hour deposition of Courtney F. Foos, Jr., and the 26(a) disclosure by Courtney F. Foos Coal Co. prior to the deposition of Courtney F. Foos, Jr.

2)      Rule 45 subpoena duces tecum is not applicable to non-parties to the civil action.

3)      Service of the subpoenas on February 17, 2006, fails to allow reasonable time for

compliance.

4)      The subpoena subjects the party recipient to an undue burden.

5)      The subpoena requires disclosure of trade secrets, etc.

6)      The subpoena requests information which is not relevant or likely to lead to the discovery of relevant materials and were being sought to harass.

7)      Improper return date of March 13, 2006, when the Dominick LaRosa parties do not start presentation of their case until April 3, 2006.

8)      Improper scope of the subpoena.

9)      To the extent tax returns and supporting documentation is sought, disclosure is disfavored unless:

        a.      relevant to the subject matter in dispute

        b.      the party seeking the information shows a compelling need exists for the tax return information because it is not obtainable from other sources. *Terwilliger v. York International Corp.,* 176 FRD 214 US Dist Lexis 15117 (W.D.Va. 1977).

### *Dominick LaRosa Parties*

The Dominick LaRosa parties generally contend:

1)      Service of the subpoenas is proper under both the settlement agreement and the arbitration protocol because:

        a.      The arbitration protocol provides for service of subpoenas to "facilitate the presentation of documents and witnesses at the hearing."

        b.      The arbitration stipulation allows for the use of subpoenas duces tecum to

                obtain documents returnable at the hearing.

    c.       The arbitration stipulation does not prohibit service of subpoenas on parties.

    d.       Parties are pound to provide access to relevant and material evidence.

    e.       Service of a subpoena duces tecum on a party is proper under Rule 45.

2)     The documents and things requested are relevant.

    a.       The information sought is relevant to the role of a particular witness or person or entity (party or non-party) in the alleged interference with business relationship and is relevant to his bias and interest.

    b.       "Bird dog payments" may impact the royalty that should have been paid to Dominick LaRosa.

3)     The return date of March 13, 2006 is proper to facilitate the presence of the documents for cross examination.

4)     The subpoena recipient has not carried the required burden of establishing the time was unreasonable or the burden too great.

5)     The subpoena recipient has not carried the burden of proving the alleged confidential or proprietary nature of the documents he seeks to shield from production under the subpoena.

### *ANALYSIS*

The issue as presented by the facts of this case has not been addressed by the Fourth Circuit.

However, District Courts have addressed a similar issue, to wit: whether a subpoena duces tecum used as a discovery tool after discovery has been cut off is subject to being quashed. In the breach of restrictive covenants in an employment contract case of *Mortgage Information Services,*

*Inc. v. Kitchens, et als*, 212 F.R.D. 562 (WDNC 2002) the Court held: "After reviewing the relevant case law on both sides of this issue[9], the Court adopts the rule followed by the majority of jurisdictions and holds that a Rule 45 subpoena does in fact constitute discovery. *See, e.g. Dreyer v. GACS, Inc.,* 204 F.R.D. 120, 122 (N.D.Ind. 2001) (noting that '[m]ost courts hold that a subpoena seeking documents from a third-party under Rule 45(a)(1)(C) is a discovery device and therefore subject to a scheduling order's general discovery deadlines') (citing Sergent, 34 MD. B.J. at 58); *integra lifsciences I, Ltd. v. Merck,* 190 F.R.D. 556, 561 (S.D.Cal. 1999) (observing that '[c]ase law establishes that subpoenas under Rule 45 are discovery, and must be utilized within the time period permitted for discovery in a case)'; *Marvin Lumber and Cedar Co. v. PPG Indus., Inc.,* 177 F.R.D. 443, 443-444 (D. Minn. 1997) (holding that subpoenas duces tecum meet the definition of discovery contained in Rule 26(a)(5), and that they are therefore 'subject to the same time constraints that apply to all of the other methods of formal discovery'); *Rice*, 164 F.R.D at 557 ('Rule 45 subpoenas duces tecum ... constitute discovery.'); *7 Moore's Federal Practice §* 34.03(2)(a) (stating that, '[a]lthough Rule 45 is not limited by its terms to nonparties, it should not be used to obtain pretrial production of documents or things, or inspection of premises, from a party in circumvention of discovery rules or orders').

The Eastern District of Pennsylvania has held that "[t]rial subpoenas may not be used, however, as means to engage in discovery after the discovery deadline has passed." *Puritan Inv. Corp. v. ASLL Corp.,* 1977 WL 793569 (E.D.Pa). After discovery ended on October 22, 1977, and after 18 weeks of discovery without a request or extension, the trademark infringement case was

---

[9]Is a Rule 45 subpoena discovery thereby requiring that it be filed and served prior to the close of the discovery period?

placed in the trial pool.  On November 24, 1977, the Plaintiff served subpoenas on the Defendants to produce at trial broad array of documents.  The Defendants objected and moved to quash and for a protective order citing that the documents were voluminous, not easily obtained and production would necessarily delay the trial.  The Court in granting the protective order and quashing the subpoenas found: "There is absolutely no indication that plaintiff knows what information is contained in the documents it seeks or that they would support plaintiff's theory of its case.  A trial subpoena is not an appropriate means of ascertaining facts or uncovering evidence.  This should be done through discovery in the manner and time provided by the Federal Rules and court order."

In the instant case, the language of the Parties' Agreement is clear.  They agreed to:

1)    **Expedited Arbitration without discovery except for a single four hour deposition of Courtney Foos and Rule 26(a)(1) disclosures by Foos Coal.**  (Term Sheet par. 1)

2)    **The parties agree to expedited arbitration without discovery except for a single four hour deposition of Courtney Foos.  Foos Coal agrees to provide a Rule 26(a)(1) disclosure at least 3 days prior to the deposition of Courtney Foos.**  (Stipulation par. 8)

Read in conjunction with the remaining clauses in the Term Sheet and in the Stipulation and considering that the documents were drafted by one of counsel for The Dominick LaRosa parties, the Court finds that the clear and unequivocal intent was that there would be no discovery except for the four hour deposition of Courtney Foos and the 26(a)(1) disclosures of Foos Coal.

The remaining language within Paragraph 8 of the Stipulation and which comes after the two sentences foreclosing all but the expressly permitted discovery limiting  what can be discovered from Foos Coal.  For instance, the first sentence is a statement of agreement by the parties that "Foos Coal's contracts with utilities are subject to confidentiality agreements."  The next sentence protects

those contracts with utility customers and their price terms from discovery or admissibility. The very next sentence states: "Said prohibition regarding discovery shall not preclude a party from utilizing subpoenas duces tecum in advance of any hearing to obtain documents returnable at the hearing; however, such subpoenas duces tecum shall not seek discovery or disclosure of Foos Coal's contracts with its utility customers, including but not limited to price terms." This sentence is clearly referring to the prohibition in the next prior sentence relating to Foos and his contracts. It is not a stand alone clause permitting the issuance of subpoenas, particularly for discovery purposes. Based on the language and structure of Paragraph 8 of the Stipulation, the Court, without more, concludes that:

1)     There was to be no discovery except for:

   1)     One four hour deposition of Courtney Foos,

   2)     The Rule 26(a)(1) disclosure of Foos Coal and ;

2)     Subpoenas could be used to get Foos Coal to produce documents returnable at the
         hearing provided they did not seek confidential agreements with utilities or
         their price terms.

It is apparent from the actions of the parties (5.4 or the arbitration protocol and the letter memorializing the final pre-arbitration conference of February 16, 2006) that they all believed they agreed to use subpoenas for the limited purposes of obtaining documents returnable at the arbitration hearing. That is a broader interpretation of the agreement than the Court reads into the it. However, the Court is bound by the way the parties interpret their own agreement.

The problem is that, while the parties apparently interpreted their agreement to allow them to issue subpoenas to require persons or entities to produce documents at the hearing, they disagree

with respect to the use of the subpoena power to conduct discovery. They also disagree whether the Dominick LaRosa use of the subpoena power was for the purpose of discovery under the guise of production of documents as opposed to simply to insure the production of documents at the arbitration hearing.

During the hearing, the Court repeatedly inquired of the Dominick LaRosa parties' counsel relative to how they would use the information they were seeking by the subpoenas. Counsel asserted they needed the information to give to their expert witnesses so they could prepare their testimony. Basically, counsel Glasser, in response to the Court's questions said that they would gather the documents on the first day of the hearing and give them to their clients experts who would sort through them looking for information and would extract the information they found, if any, and use it in preparing the charts and schedules they would use in preparation for and in support of their testimony.

Notwithstanding Glasser's statements to the Court, counsel Gottlieb argued the information was essential for cross-examination, particularly with respect to bias of the witness.

However, the Court finds no more telling proof exists of the subpoenas at issue being for discovery and not to produce the contents of documents already known to exist than the sworn words of Roger L. Osborne, one of the Dominick LaRosa parties' experts: "Therefore, in order to have a complete understanding of the accounting for the transactions, the expenses and profits, it is important for me to examine the financial records of Cheyenne from 2001-2005 as well as the tax returns for those years." (Osborne Affidavit attached as exhibit to Defendants' Motion To Compel The Production Of Documents Under Subpoena Duces Tecum Issued To Roblee Coal Co., Rob Jeran and Johnny Bischoff - Docket Entry 192).

Based on the Court's own review of the myriad of matters sought in each of the subpoenas in question, the Court is able to conclude that the Dominick LaRosa parties hope without actually knowing that the documents will provide information about payments made to various individuals and entities to assist in determining whether money that could have been paid to Dominick LaRosa was improperly siphoned off; whether all the Dominick LaRosa coal mined during 2000 to 2005 was properly accounted for; and to use information that is hoped to be contained in the documents in an attempt to convince the arbitrators what a fair and reasonable per ton royalty payment to Dominick LaRosa should have been.

The Dominick LaRosa parties' counsel have failed to convince the Court that the documents being requested by the subpoenas at issue are for the purpose ensuring the availability at trial of original documents previously disclosed by discovery. Counsel for the Dominick LaRosa parties told the Court during the March 9, 2006, hearing that they did not know specifically what was in the documents being sought. They also told the Court that they did not know if the documents being sought contained the information they were suggesting may be relevant to the issues before the arbitrators or whether the documents being sought even existed as to a particular subpoena recipient. These conclusions are supported by the following brief examples:

From the Virgil B. LaRosa (a non-party) subpoena:

1.    "complete copies of all your Federal and State Income Tax Returns for the years 1995 through 2005"

2.    "copies of all documents, ... you provided to any accountant or accounting firm for the purpose of preparing your tax returns for the years 1995 to 2005."

3.    "copies of all records or documents memorializing or referencing all payments or

monies ... you received from Regal Coal Company, Cherokee Processing, Inc., and or Cheyene Coal Sales form 2000 through 2005."

From the Joe Staud (non-party) subpoena:

1) "all records or documents memorializing or referencing any payments ... you received from Courtney F. Foos, Jr. or Courtney F. Foos Coal Co. from 2000 to 2005."

2) "all records or documents constituting, memorializing or referencing any correspondence or direct communications you had with Courtney F. Foos, Jr. or Courtney F. Foos Coal Co. from 2000 to 2005."

3) copies of all you Federal and State Income Tax Returns for the years 2000 through 2005"

4) "copies of all documents, ... you provided to any accountant or accounting firm for the purpose of preparing your tax returns for the years 1995 to 2005."

From the Courtney F. Foos Coal Co. (party) subpoena:

1) "all of your Federal Tax Returns for the years 1995 through 2005"

2) "all records or documents referencing or memorializing any payments or monies you made or gave to Regal Coal Co., Inc., Cheyenne Coal Sales and/or Virgil D. LaRosa form January 1, 2000, through December 31, 2005 for the purchase of coal."

11) "any and all articles or [sic] incorporation, corporate by-laws and minutes or shareholder or board meetings."

10) "all correspondence to or from First Energy Generation Corp. regarding any power plant shut down or disruption on or about August 15, 2002 allegedly attributable to

coal which you sold to First Energy Generation Corp."

9)      "all records or documents memorializing or referencing all monetary transactions with Regal Coal Co., Inc. from January 1, 2000 through December 20, 2002."

In some instances the subject matter of the request is potentially relevant.

However, these requests are examples of entirety of the Dominick LaRosa parties subpoenas and clearly reflect the "shot gun" approach they were using. It is an approach which is identical or almost identical to that which would be used by a party who is searching for evidence in support of his theory or claim during the discovery phase of the case. During the arguments on March 9, 2006, the Dominick LaRosa parties' counsel admitted that some of the tax return information they had requested by subpoena would include information that was totally irrelevant to the pending arbitration. The same admission would have to be made for blanket requests for correspondence, board meeting minutes, information given to accountants and other requests made.

The parties had months to conduct discovery in this civil action prior to reaching an agreement to go to binding arbitration without discovery. As shown by the facts found by the undersigned as a result of approximately four (4) days of preliminary injunction hearing testimony, the parties knew what the issues were almost from the outset of the litigation. The parties engaged in discovery prior to agreeing to go to binding arbitration. The parties settled and agreed to binding arbitration a matter of days prior to the case proceeding to a District Court jury trial. The docket of this case reveals that there was not a single amendment or addition of a party or claim in the record of the case after the parties told the District Judge that they had agreed to go to binding arbitration. The Dominick LaRosa parties should have been prepared to try the case to a jury over a year ago. When asked during the hearing of March 9, 2006, counsel for the Dominick LaRosa parties

informed the Court that they were prepared to go to trial before the arbitrators.

No doubt exists that some of the information sought by the subpoenas issued by the Dominick LaRosa parties may relevant to the issues pending before the arbitrators. There is no doubt that some of the same information is being sought through subpoenas from multiple sources, including parties and non-parties.

The Court concludes that the subpoenas at issue are for the veiled purpose of discovery in violation of the agreement of the parties that there would be no discovery. The Court's ruling with respect to the motions to quash is dispositive of the issues raised by the Dominick LaRosa parties' Motion to Compel The Production of Documents Under Subpoena *Duces Tecum* Issued to Roblee Coal Co., Rob Jeran and Johnny Bischoff [Docket Entry 192]**;** Defendants' Motion to Compel the Production of Documents Under Subpoena *Duces Tecum* Issued to Cheyenne Coal Sales, Inc.[Docket Entry 194]; Defendants' Motion To Compel The Production Of Documents Under Subpoena Duces Tecum To Deborah Reif (Docket Entry 206); and Defendants' Motion To Compel The Production Of Documents Under Subpoena Duces Tecum To Robert R. Fraser (Docket Entry 207). The Court concludes that since the overwhelming and only clearly identifiable purpose behind the Dominick LaRosa parties' issuance of the disputed subpoenas was discovery prohibited by the parties' agreement, it does not matter that several of the subpoenas were to witnesses who are not parties as opposed to parties.

Based on the responses of Counsel during the argument, the Court further concludes that if it becomes apparent to the Arbitrators during the Arbitration that essential documentation is not present, the Arbitrators have the authority to request documentation or direct the parties or a witness to produce the documentation they deem essential to the Arbitration. The Court has already entered

an order which makes the federal subpoena power available to the parties and or arbitrators should that need arise. This should reduce or eliminate any possible prejudice to a party as a result of this ruling.

The Court took in to account the fact that the parties agreed to "expedited arbitration." The parties selected arbitrators knowledgeable in the law and business involving coal, coal mining production and contracts.

For the reasons stated herein, each of the following named Motions is **GRANTED:** Motion to Quash and Motion for Protective Order by Courtney F. Foos Coal Co., Inc. [Docket Entry 156]; Motion to Quash and Motion for Protective Order by Regal Coal Company, Inc., Cherokee Processing, Inc., and Virgil D. LaRosa [Docket Entry 158]; Plaintiffs' and Intervenor's Joint Motion to Quash Supboenas *Duces Tecum* to Non-Parties or, in the Alternative, Motion for Protective Order [Docket Entry 159]; Motion to Quash or Modify the Subpoena Served upon F. Joseph Staud [Docket Entry 188]; Motion to Quash Subpoena Served upon Virgil B. LaRosa [Docket Entry 190] and each subpoena duces tecum identified in each of said motions is **QUASHED.** For the reasons stated herein Defendants' Motion to Compel The Production of Documents Under Subpoena *Duces Tecum* Issued to Roblee Coal Co., Rob Jeran and Johnny Bischoff [Docket Entry 192] is **DENIED;** Defendants' Motion to Compel the Production of Documents Under Subpoena *Duces Tecum* Issued to Cheyenne Coal Sales, Inc.[Docket Entry 194] is **DENIED;** Defendants' Motion To Compel The Production Of Documents Under Subpoena Duces Tecum To Deborah Reif (Docket Entry 206)(filed March 15, 2006) is **DENIED**; and Defendants' Motion To Compel The Production Of Documents Under Subpoena Duces Tecum To Robert R. Fraser (Docket Entry 207)(filed March 15, 2006) is **DENIED.**

Because the Court has construed the parties' agreement to prohibit the use of the subpoena power for discovery and that the Dominick LaRosa parties did so in issuing and serving the subpoenas in question, the Court does not address the other contentions of the parties, including but not limited to relevance, burdensomeness, privacy and lateness with respect to filing and service.

**IT IS SO ORDERED.**

The United States Clerk for the Northern District of West Virginia is directed to provide a copy of this order to counsel or record.

DATED: March 16, 2006

/s *John S. Kaull*

JOHN S. KAULL
U. S. MAGISTRATE JUDGE